**WILLIAMS v. McCAUGHN, Collector of Internal Revenue.**

(District Court, E. D. Pennsylvania. January 26, 1927.)

No. 11620.

1. **Internal revenue** ⟲—2(3)—**Tax on club dues held constitutional (Revenue Act 1921, § 801 [Comp. St. § 6309⅝b]).**

Tax on club dues imposed by Revenue Act 1921, § 801 (Comp. St. § 6309⅝b), is not a direct tax and its imposition was within the powers of Congress.

2. **Internal revenue** ⟲—11—**Statute imposing tax on life members of clubs held not retroactive (Revenue Act 1921, § 801 [Comp. St. § 6309⅝b]).**

The provision of Revenue Act 1921, § 801 (Comp. St. § 6309⅝b), requiring a life member of a club to pay annually, "at the time for the payment of dues by active annual members, a tax equivalent to the tax upon the amount paid by such a member," does not apply to one who held a life membership before the statute was enacted.

At Law. Action by Ira J. Williams against Blakeley D. McCaughn, Collector of Internal Revenue. Judgment for plaintiff.

Wm. Clarke Mason and Ira J. Williams, both of Philadelphia, Pa., for plaintiff.

George W. Coles, U. S. Atty., of Philadelphia, Pa., and Ralph S. Scott, of Washington, D. C., for defendant.

Sur Statutory Demurrer.

DICKINSON, District Judge. We have not had access to the record, but have given the case a subheading in accordance with the information furnished us. Whether the case is before us in effect on demurrer or as a case stated, we understand it is in shape for final judgment. Counsel will readily adjust the formalities.

The question is the lawfulness of a tax exaction imposed because of a life membership in the University Club of Philadelphia. The tax was levied under section 801 of title 8 of the Revenue Act of 1921 (Comp. St. § 6309⅘b). The plaintiff pays no dues upon which the 10 per cent. could be based, but he did pay a lump sum of $750, for which he was exempted from the payment of annual dues. We may presume that the one was regarded as the equivalent of the other. The questions raised relate to (1) the constitutional power of Congress to levy the tax; and (2) the inclusion of the plaintiff among those who are to pay it.

### 1. The Power.

[1] The argument of this question has necessarily taken a wide range. It deals with questions, the discussion of which is well-nigh interminable, and with what would be very interesting and enjoyable in a thesis on government or politico-economics, and which has a place in the argument of counsel, but would be painfully academic in a judicial deliverance. Moreover, it deals with the fundamental principles of our government, to which every one has given more or less reflection, and upon which he has notions of his own, more or less crude and unsound in the opinion of others. At the same time, a decent respect, not merely for the industry and ability displayed by counsel, but for the motives which inspired the plaintiff to resist the payment of this tax exaction, commands a full review of the whole argument. Hampdens should be appreciated and encouraged. Every state, except possibly the one evidenced by the famous sigh of Alexander, has territorial limitations of its power. Theoretically a sovereign state has no other limitation. It must have the power to levy and collect taxes, for the very simple and practical reason that it cannot otherwise live. Its very existence proves its possession of this power.

Just here comes in a distinction often overlooked. A state is a concept. It does not come into the realm of facts until and except as the subject comes into contact with another individual, who is or acts as if he were clothed officially with the power of the state. Such official is pro illa vice the ruler and the personification of the state. In those countries in which all the powers of the state are theoretically centered in one individual, he may say in this sense with truth, "I am the state." So far as we know, there has been but one man who is said to have said this, but thousands of officials act as if they thought it.

The American concept is that the body of the people constitutes the state and that the ultima thule of power is in them. Any official or department of government, assuming to be clothed with any of the powers of the state, must find in the Constitution a grant of it. We thus get the phrase of constitutional limitations. The real question, therefore, is not what are the powers of government, but what were the powers of this individual defendant who exacted this payment? We are subject to a triune government. Our rulers are the Congress, the Executive, and the Supreme Court. We have listed them, not in the order of official dignity, but in the order in which the Constitution has granted them their respective power and authority.

This leads to another diversion. Minds which acknowledge subjection to the laws of logic, or of economics, or of sound principles of government, are apt to assume that, if a statute offends in these respects, it is unconstitutional. The legal doctrine of constitutionality is much narrower than this and much more simple. Neither logic, nor economics, nor principles of government, nor even ethics, have anything to do with the question. An enactment may be illogical, economically unsound, unwise in policy, and indeed unjust, and yet no court will be able to pronounce it unconstitutional. The converse is likewise true. No court would declare it to be constitutional merely because it was wise or beneficent.

This defendant justifies his act by the command of this act of Congress. If, for illustration, the tax had been imposed by an executive proclamation, or a decree of the Supreme Court, its lawfulness would not be asserted, because the Constitution has conferred no such power upon either. It was, however, imposed by Congress, so the question is one of the powers of Congress. In the case of a statute, the first question is the power of Congress to deal with the subject-matter. If it has, it may deal with it in its own way, subject only to such limitations of the power or qualifications of the mode of

its exercise as may be found in the Constitution.

The powers of Congress are enumerated in the eighth section of article 1. The very first of them is the power "to lay and collect taxes, duties, imposts and excises." Congress thus has clear power over the general subject-matter. Ignoring the uniformity qualification, which is not pressed, the only pertinent provisions are those in clause 3 of section 2 of the same article, which couples "representatives and direct taxes," and clause 4 of section 9, which reads, "No capitation, or other direct, tax shall be laid, unless" in a manner which was not here followed. It is to be observed that the denial here is not of the power, but of the mode of its exercise. The generic term "taxes" is inclusive of every compelled contribution to the expenses of government. The Constitution differentiates in the grant of the power to lay, by calling the levies taxes, imposts, and excises. Common speech adopts the same distinctions and has added other names.

The cynically minded might see a policy behind these classifications. Tax impositions follow along the lines of least resistance. If a tax was imposed upon all the people in one class, the objections to the imposition would be correspondingly strong. If the people are classified into divisions, the objections of those taxed are smothered in the indifference of the others. The whole people can thus be reached by successive tax levies, and at the same time the opposition be made negligible. The taxing power is inclusive of all forms and kinds of taxes. The limitation is restricted to what are specifically (not generically) taxes, and further to direct taxes, and still further is aimed, not at the power to impose the tax, but, as before stated, at the mode of its imposition. It has not, so far as we know, been authoritatively ruled that any tax which is not an excise is necessarily a direct tax; but this is none the less very close to being a postulate in the reasoning employed in many of the cases. This means that whatever is a tax in this specific sense is a direct tax. The Constitution, however, has differentiated them by using both terms.

If the two questions are not the same, the case presents not merely that of what is a tax, but the narrower question of what is a direct tax. This invites, as the Pollock Case, 157 U. S. 429, 15 S. Ct. 673, 39 L. Ed. 759, has provoked, a discussion of the distinctions to which we have adverted. If we follow the economists in their discussions of what is a direct tax, we must inquire into the nature of property and of property rights, and the difference, if there is any, between a right and a privilege to which there is a right. The difference between property and its use is clear enough, but that between a right to property and the right to its use is a trifle shadowy. There is likewise also a distinction between a tax on property, upon the basis of its assessed value, and a tax imposed on the owner, based upon his ownership and measured by the value of the property; but the practical difference in respect to the kind of tax it is found to be is not great. There may, of course, be a difference in the mode of its collection and enforcement. Tax laws likewise make a distinction between property and its yield.

In following up these and other distinctions, the minds of those other than the unco wise are apt to be lost in metaphysical mazes and verbiage. There is, however, a recognized classification, whether scientifically sound or not, between things (other than human beings) and persons, natural and artificial. There are also some incorporeal rights which, because the rights have become merged in the corporeal things which evidence the right, have in common speech come to be things, and the law follows the common speech usage. Bank notes, shares of stock, bonds, mortgages, and the like are illustrations. Things, as the subject of property, and their yield, and human activities which concern things, are also recognized, and from the latter common speech is enriched by the words "vocations," "trades," "professions," "business," and the like, and we get the thought, in the phrase of counsel, of a transaction. The difference between taxes is not to be found in the nature of the imposition itself, but is to be looked for in the kind or nature of the thing in respect to which it is imposed, or in some occasion for its imposition. We thus have real estate and a tax, tobacco and internal revenue taxes, goods imported and customs duties, business and a mercantile tax, or license fee, and a carriage used as a public bus and an excise tax. We have also a succession at death with a tax, the specific nature of which has not yet been authoritatively defined, and gifts of property and a tax, of which we are also yet to learn. We have also taxes on moneys at interest and income taxes.

We have in this partial list blended taxes imposed by Congress and by the Legislatures of the states, to get into mind the different kinds of taxes and tax nomenclature. All taxes are doubtless direct to those who

have the concept that any tax is the enforced contribution of the individual taxpayer for law protection, and that the distinctions in name and otherwise are merely differences in the mode of the measurement of the sum to be paid in terms of the value of the property or of the activity he has to be protected and thus the value of the protection afforded. It is, however, the practical fact that the results of such a measurement may be nil in respect to property or any business or calling, and yet in respect to protection afforded to the person a tax be levied on the basis of an arbitrarily assumed yield which does not in fact exist, as in the case of the ordinary occupation tax, or even without this as in a head or capitation tax. We thus get still another kind of tax. The latter is in common speech known as, and beyond question in law is, a direct tax, and one which has a direct relation to population. If we stick to this, we are standing on solid ground; but the moment we stray away from it we get into the domain of concepts and figments of the brain, which are as unsubstantial and unstable as clouds. If the hearer yields himself to the spell of the argument which may be woven out of these fine-spun distinctions, wholly different things will look to be alike as the cloud looked to Polonius very much "like a camel indeed."

The historical interpretation makes this provision of the Constitution clear enough. There was that difference in the then laws of the different states respecting those who made up their population numerically that it had been deemed wise to apportion representation by clause 3 of section 2 of article 1 in such a way that in parts of the country all the people were computed as a basis of representation, and in other parts three-fifths only of a large portion were so counted. It is known to every schoolboy that at the time of the adoption of the Constitution, and for years before, our people not merely believed in the governmental principle that taxation and representation should go hand in hand, but it had been a fetish and a battle cry with them. Having restricted representation, they could do nothing else than restrict taxation in the same way; but it is to be as before observed that they limited the restriction to "capitation or other direct tax." Any one would venture the safe prediction that, had not representation been restricted as it was, the tax restriction would not have been inserted. The Thirteenth Amendment did away with the one, and the other was in near danger of going with it as repealed by implication in accordance

with the maxims "cessante ratione cessat et lex" and "cessante causa cessat effectus." The Supreme Court held, however, that these provisions of the Constitution had not been taken out by amendment, and that direct taxes must still be apportioned according to population.

We are not permitted, however, to read into the Pollock Case, supra, more than it decides. The ruling was that a tax different from the tax before us was a direct tax. The experienced counsel who argued this case for the defendant, and who are highly and specially trained in and familiar with the tax laws and the decisions thereon, have fairly analyzed and classified all the rulings made, and none as yet have authoritatively laid down any principle which rules the instant case. The oft-cited carriage case, Hylton v. United States, in 3 Dall. 171, 1 L. Ed. 556, as well as the Pollock Case, supra, are helpful in determining what is a direct tax, as are also the succession at death tax cases and others. The ownership of carriages and succession to property on the death of the former owner are ruled to have no relation to population; nor has life membership in a club, so far as we can see. A head or capitation tax clearly has, and it has likewise been ruled that a tax on land, or a tax on property by reason of ownership, or a tax on income, including that derived from general ownership, likewise has relation to population.

Our attention has not been called to any case which has authoritatively defined for us what a succession tax is, but as the tax has been upheld, in view of the Pollock Case, must have been held not to be a direct tax.

The conclusion reached is that the tax in question is not a capitation or other direct tax, and that Congress had power to levy it.

### 2. The Taxing Act.

[2] The only remaining question is whether Congress has commanded this defendant to collect this tax from the plaintiff. What Congress can be assumed to have had in mind was that having taxed those members of these clubs who paid annual dues, it was no more than right that those who paid no dues should pay a like tax; but whoever chose the verbiage had something additional in mind. The phraseology is worth quotation:

"In the case of life memberships [which is the case before us], a life member shall pay annually, at the time for the payment of dues by active resident annual members, a tax equivalent to the tax upon the amount

paid by such a member [we assume this means the annual dues paying member], but shall pay no tax upon the amount paid for life membership.".

If the query is not of the famous "chops and tomato sauce" variety, why all this circumlocution? Were there specters in the ghostly form of possible judicial rulings in his mind? To conjure them up would not be difficult. In this case they come readily on call. The payment by this plaintiff of a sum which exempted him from the payment of annual dues long antedated the passage of the tax law. To tax him for a payment which he had made years before was unthinkable, and hence the thought to do so was carefully excluded. If his tax was not gauged by what he himself had paid or done, some "transaction" in which he had figured, on what should it be based? Classic history and all literature has made everybody familiar with the phrase "Scylla and Charybdis" and its import. Scylla was readily avoided by striking out what the plaintiff had himself done, but a more dangerous Charybdis remained in the form of the accepted proposition that you cannot measure one man's tax by another man's possessions, and by the same token we assume you cannot tax one man because another follows a trade or profession, or has any kind of a "transaction."

In the attempt to bring this plaintiff within the provisions of this act, the defendant must make his choice between basing the tax on a payment by the plaintiff, which the act itself forbids, or upon something which some one else did, which the law condemns. If Congress had in mind to tax only those who thereafter might assume the status of life members, all difficulties disappear. There is no prohibition in the Constitution against retroactive tax laws, or indeed of any kind other than ex post facto laws. When, however, we are hunting for the meaning of an enactment, there will not be imputed to Congress, if another can be found, a meaning which is obnoxious to the common sense of what is right, just, and fair, and in tax laws a meaning which offends against sound economic principles. There are exceptional cases in which no one would condemn a retroactive statute, and indeed some in which a statute could have no other reason for its enactment. In such cases the command of Congress, being clear, will of course be followed by the courts; but no such meaning will be given by doubtful construction.

There is again the thought that a tax (although this has not as yet been authorita-tively ruled) escapes being a direct tax only when it comes into the category of duties, imposts, or excises. The act in consequence was intended to be on a privilege to be enjoyed, or a "transaction" in which the taxpayer could have part. There is ample room in the ruled cases for the thought, well expressed in the phrase used in Le Fabre v. Wilkinson, that an excise tax operates only in futuro. This is what we have always understood to be of the essence of an excise tax, without thought of a question over it. The taxing acts which impose an excise tax are in effect admonitions to all who wish to enjoy the privilege, or to have a part in "transactions" in respect to which the tax is imposed. "You may do as you please respecting this, but, if you enjoy the benefits, it is only at the cost of the announced tax payment." To give a retroactive effect to such a statute is to give no choice, nor afford any escape, but to penalize the taxpaying victim for what he has already innocently done.

Indeed, the words of this act would apply to those who might have been made life members without doing anything beyond accepting the honor, if any club chose to so honor them. We can readily see in this legislation the command of Congress that all who thereafter take out a life membership shall pay a tax based on the club dues, the payment of which they have by their own act escaped; but we find in it no command to impose payment upon a life member for what he had long before done. We are not sure that we understand the position of the defendant with respect to this feature of the case. As we are impressed by the argument, it seems to us that, in arguing in favor of the constitutionality of the statute, they have let the plaintiff out of its application. It is only fair that they be judged by their own words. "The statute imposes a tax upon expenditures. It falls only on such persons who pay for membership in the club, and can be escaped by not indulging in such expenditures. As is said by Mr. Justice Patterson in Hylton's Case, supra, the person taxes himself."

If the tax is limited to future life members, this is clear enough. As applied to existing members, it seems to us equally clear in its implications. The doubt in our mind is, not what this language means, but whether it is a confession of no defense, or is merely another case of Scylla and Charybdis.

A formal judgment in the usual form may be entered for plaintiff.